**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Catrice M. Ford,

      Plaintiff,

  v.                                  Case No. 1:05cv557

Hamilton County Juvenile Court,          Judge Michael R. Barrett

      Defendant.


**ORDER**

      This matter is before the Court upon Defendant Hamilton County Juvenile Court's Motion for Summary Judgment.  (Doc. 28)  Plaintiff Catrice Ford has filed a Memorandum in Opposition (Doc. 31); and Defendant filed a Reply (Doc. 33).  This matter is now ripe for review.

**I.**    **BACKGROUND**

      In October of 1999, Ford was hired to work as a Juvenile Correction Officer in Hamilton County's Youth Center.  (Doc. 27, Catrice Ford Depo. at 6-7)  The Youth Center is a division of the Juvenile Court.  At the Youth Center, Ford worked directly with the youths in various capacities, processing their property and conducting strip searches upon admission, and conducting transfers to the medical department.  (Id. at 11)  Ford also completed reports and controlled access to the building.  (Id.)  There appears to be no dispute that Ford had a fairly positive attitude, knew her job, and was a diligent employee. (Doc. 26, Harvey Reed Depo. at 8; Doc. 32-4, John Harten Depo. at 10)

      On February 19, 2005, Ford attended a birthday party for one of her coworkers at

a nightclub in Springdale, Ohio.  (Ford Depo. at 16, 20, 21)  One of Ford's coworkers, Michael Cherry, attended the party with his wife.  (Id. at 21-23)  Before being introduced to Cherry's wife, Ford joked with Cherry that they were "really going to have a ball" since his wife was not there.  (Id. at 23)  Apparently taking offense at Ford's jokes, Cherry's wife later confronted Ford.  (Id. at 24-25)  Rejecting Ford's apologies, Cherry's wife nudged Ford's forehead with a pointed finger.  (Id. at 25)  Ford responded by hitting Cherry's wife's cheek with a closed fist.  (Id. at 25-26)

The next day, Ford contacted Springdale Police and learned that there was a warrant for her arrest.  (Id. at 28)  Ford reported the incident to the Superintendent of the Youth Center, Harvey Reed.  (Id. at 35, 36, 41; Reed Depo. at 10-11)  Ford admitted to Reed that she had punched Cherry's wife.  (Reed Depo. at 11)  Ford alleges that Reed told her that her job was secure because she was not charged with a felony, and the incident took place outside of the workplace.  (Ford Depo. at 36-37)  Reed does not remember telling Ford anything specifically about her job, "other than she shouldn't worry about it," and she needed to take care of the legal matters first.  (Reed Depo. at 13)

On February 23, 2005, Ford appeared in Springdale Mayor's Court for what she thought was a plea hearing.  (Ford Depo. at 32-33)  Misunderstanding procedure, Ford pled "no contest."  (Id. at 33, 35)  Ford did not realize that this had the same effect as pleading guilty; she believed that later she would be allowed to establish that her actions were in self-defense.  (Id. at 33-34)  On February 24, 2005, Defendant received a faxed copy of the Mayor's Court's disposition of guilty.  (Doc. 28, Ex. 1)  That same day, Defendant placed Ford on administrative leave.  (Doc. 32-5)

Defendant conducted an investigation into Ford's arrest.  (Reed Depo. at 18-19)[1] Based upon the investigation, Deputy Superintendent Dwayne Bowman and Assistant Superintendent John Harten recommended to Reed that Ford be removed from her position.  (Bowman Depo. at 14, 17.)

On March 3, 2005, Bowman met with Ford and presented her with documents outlining Reed's intent to terminate her.  (Ford Depo. Ex. 11; Ford Depo. at 50, 52) Bowman told Ford things had not "work[ed] in [her] favor and [Defendant] was going to present [her] with this paper of removal."  (Ford Depo. at 52; Ex. 11)  Bowman presented Ford with a form titled "Recommendation for Removal."  (Ford Depo. Ex. 11; Ford Depo. at 18, 53)  On the form, Plaintiff's actions are classified as a "Class III" Infraction based on a "Failure of Good Behavior."  (Ford Depo. Ex. 11)[2]

Ford did not inform Bowman that she was appealing her conviction.  (Bowman Depo. at 32)  Ford claims that when she asked about her right to a predisciplinary hearing, Bowman told her that it would "not be in [her] best interests" and he would not recommend her pursuing it.  (Ford Depo. at 53, 56-57)  Ford claims that when she asked for the basis of his advice, Bowman told her that the same people who made the decision to pursue

---

[1]This investigation is required according to Defendant's Employee Handbook: "When a county employee is involved in criminal charges, proof of which would be grounds for disciplinary action, the administration shall make its own investigation of the employee's conduct, and, after such investigation, make appropriate disposition of the matter without regard to the pending legal action."  (Ford Depo., Ex. 1)

[2]Defendant maintains a progressive discipline system.  (Ford Depo. Ex. 17)  Infractions are classified based upon impact upon safety, productivity, efficiency and morale.  (Id.)  Class III Infractions are those "which are of a very serious nature and cause a critical disruption to the organization in terms of decreased safety, security, productivity, efficiency or morale.  (Id.)  The discipline for a Class III Infraction is suspension without pay for a minimum of five days, or termination.  (Id.)  One of the listed examples of Class III Infraction is "[t]hreatening, intimidating, fighting, coercing or interfering with others."  (Id.)

termination were those she would appear before in a hearing.  (Id. at 53-54, 56-58)
Bowman explained that the only matter to be determined at the hearing was the factual
basis for the termination and not whether the discipline was appropriate.  (Bowman Depo.
at 20)  Ford believed that she had no reasonable hope of saving her job at the hearing.
(Ford Depo. at 53-54, 56-58)  In addition, Ford believed if she resigned, she would be
eligible for work in another entity of Hamilton County.  (Id. at 54)  Ford claims that Bowman
told her that if she was terminated, the Youth Center would tell prospective employers the
reason for her termination.   (Id.)[3]   Ford testified that because she had worked for
Defendant for almost five years, "there was no way that I could get around not reporting
this place of employment to a future employer.  And for them to call Hamilton County to say
we fired her because of a criminal charge, I felt that I would never get another job." (Id. at
54)

Ford signed the resignation form Bowman presented to her, but approximately thirty
minutes later contacted Bowman to ask for a predisciplinary hearing.  (Bowman Depo. at
31)  Bowman transferred her call to Harten.  (Id.)  However, Ford apparently did not follow
through with her request for a hearing.

On March 4, 2005, Ford met with John Konerman, Director of Personnel, to
determine whether she could find future employment with the Juvenile Court.  (Ford Depo.
at 61, 62; Konerman Depo. at 16)  Konerman asked her about the status of her
misdemeanor case, and Ford reported to him that she was appealing it. (Ford Depo. at 62;

---

[3]Bowman denies that he made this statement, but testified that he told her that he
believed that if she resigned, prospective employers would be told that she resigned.  (Bowman
Depo. at 18-19)

Konerman Depo. at 21, 23)  Konerman told Ford to contact him when the appeal was over, and he could possibly place her in another juvenile facility.  (Ford Depo. at 62; Konerman Depo. at 24)

On April 29, 2005, Ford met with Konerman again.  (Konerman Depo. at 30; Ford Depo. at 63.)  At that time, Ford's appeal of her conviction was still pending.  (Konerman Depo. at 30)  Konerman explained to Ford that she could not be reinstated because the conviction remained on her record.  (Id. at 31)

Hamilton County Municipal Court ultimately heard Ford's case, and dismissed the charge on June 20, 2005.  (Ford Depo. at 68; Doc. 31, Ex. A)  Ford, through counsel, informed Defendant that the charges against her had been dismissed and requested reinstatement, but did not receive a response.  (Harten Depo. at 62-63; Bowman Depo. at 34)  Reed refused to reinstate Ford because regardless of the conviction, Ford engaged in an act of violence.  (Reed Depo. at 29)

Ford has identified eleven male employees, who she claims were also charged with acts of violence, but were only issued written warnings.  Ford argues that four of these male employees were convicted of misdemeanors involving violence or weapons, and Defendant nevertheless continued their employment.  (Doc. 28, Exs. B-L)

In her Complaint, Ford brings claims of gender discrimination under Title VII, 42 U.S.C. § 2000e-2(a)(1), and Ohio Revised Code § 4112.02(A).

## II.  ANALYSIS

### A.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986).  The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  The mere existence of a scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the non-moving party.  *Id.* at 252.

      **B.**    <u>**Title VII**</u>

      Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

      Ford claims that gender was a motivating factor in the alleged adverse employment action taken against her, even though there were other, lawful factors which may have motivated that action.  The Supreme Court has made it clear that such mixed-motive claims can be brought based on either direct or circumstantial evidence.  *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 712 (6th Cir. 2006), *citing Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101-102 (2003).  Ford argues that there is circumstantial evidence to support her claim,

and relies upon the familiar *McDonnell Douglas* burden-shifting framework discussed below. The Court finds that this is the correct analysis. *See Tysinger v. Police Dept. of City of Zanesville*, 463 F.3d 569, 577 (6th Cir. 2006) (explaining that *Desert Palace* did not purport to alter application of the *McDonnell Douglas* framework to pretrial analysis of discrimination claims based on circumstantial evidence at the summary judgment stage).

To establish a *prima facie* case of discrimination under Title VII, a plaintiff must show that (1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was treated differently than similarly-situated, non-protected employees. *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004).

If the plaintiff succeeds in establishing a *prima facie* case, an inference of discrimination arises, and the burden then shifts to the defendant to articulate some legitimate nondiscriminatory reason for its actions. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-56 (1981). If the defendant articulates a nondiscriminatory reason for its actions, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons put forth by the defendant were not its true reasons but were a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802.

There is no dispute that Ford was a member of a protected class, but the Parties disagree as to whether Ford can establish the remaining elements of a *prima facie* case of discrimination, or whether Defendant's proffered reason for its recommendation for Ford's removal was pretext for discrimination.

1.      **Adverse employment action**

Defendant argues that Ford cannot show that she was subject to an adverse employment action because she voluntarily resigned from her position.  Citing *Plautz v. Potter*, 2005 WL 3479840, *5 (6th Cir. 2005) (unpublished), Defendant argues that it is settled in this Circuit that a threat to discharge is not an adverse employment action. However, the Court finds that the facts in *Plautz* as well as the case that *Plautz* cites in support of this proposition, *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999), are distinguishable from the facts in this case.   In *Plautz*, the plaintiff was told that a manager was out to get him by going through his military records and looking for a reason to terminate or discipline him.  2005 WL 3479840 at *5.  The court found that the manager's alleged threat, relayed to the plaintiff by a coworker and as an expression of the coworker's speculation as to why the manager was reviewing the plaintiff's employment records, was too speculative to support the conclusion that the plaintiff's firing was imminent. *Id.* at * 6. In *Hollins*, the court found that the threat to discharge the plaintiff was too ambiguous to satisfy the adverse employment action requirement because there was no evidence that the manager had the authority to transfer or terminate, and the alleged threat merely stated the possibility of transfer or discharge.  188 F.3d at 662.[4]

The Court finds that the "Recommendation for Removal" presented to Ford lacks any ambiguity.   It is clear from this form that Defendant intended to terminate Ford's employment.  This intention was reinforced by the statements made by Bowman to Ford

---

[4]In *Hollins*, the plaintiff faced criticisms from her supervisor about her hairstyles violating company policy.  The supervisor said to her, "you may want to consider if you want to continue working for this company, or if you would rather find employment at a company where you can style your hair however you want."  188 F.3d. at 657.

when he presented her with the Recommendation.  Bowman allegedly told Ford that a predisciplinary hearing would not be in her best interests because the same people who made the decision to pursue termination were those she would appear before in a hearing. Bowman also told Ford that the only matter to be determined at the hearing was the factual basis for the termination, and not whether the discipline was appropriate.  Since Ford did not dispute the factual basis of the Recommendation, contesting the termination would be futile.  Therefore, the Court finds this facts of this case make it distinguishable from *Plautz* and *Hollins.*

Ford argues that she suffered an adverse employment action in the form of constructive discharge.  To demonstrate a constructive discharge, a plaintiff must adduce evidence to show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person and (2) the employer did so with the intention of forcing the employee to quit.  *Logan v. Denny's, Inc.*, 259 F.3d 558, 568-69 (6th Cir. 2001) (citations omitted).  "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined."  *Id.* at 569*, quoting Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999).  In evaluating the first prong of this inquiry, a court should consider the following factors, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.  *Id.* at 569.

In analyzing the first prong, the Court finds that a reasonable person in Ford's

position would have felt compelled to resign. In reaching this conclusion, the Court distinguishes the case before it from an unpublished case cited by Defendant: *Driggers v. City of Owensboro, Kentucky*, 2004 WL 1922182 (6th Cir. Aug. 24, 2004) (unpublished). In *Driggers*, the court noted that even though there was evidence that the plaintiff was told that she would be charged with numerous counts of misconduct and there were fifteen witnesses who would testify against her, it did not follow that the plaintiff's only alternative was to resign. *Id.* at *6. The court noted that under state law the plaintiff could not be dismissed or disciplined without first, the formal filing of charges against her; and second a hearing before the City Commission, which would decide whether the plaintiff was guilty of the charged misconduct and then impose the appropriate penalty. *Id.* The court explained that while the plaintiff would probably receive some form of discipline, "it was speculative for her to conclude that the inevitable result of disciplinary charges before the City Commission would be her termination." *Id.*

As stated above, the Court finds that there was nothing ambiguous or speculative about the Recommendation of Removal when viewed in combination with the statements made by Bowman. Defendant's decision to terminate Ford was presented to her as a forgone conclusion. Whether this was in fact accurate or not, viewing the facts in a light most favorable to Ford, the Court finds that it was reasonable for Ford to believe that it was unlikely that a challenge to the Recommendation would be successful, and her only alternative to termination was to resign.

However, the Court finds that there is no evidence that Defendant presented Ford with the Recommendation of Removal with the intention of forcing her to quit. There is no evidence that the investigation of Ford's misconduct was instigated to result in her

termination.  In addition, there is no evidence that Ford was coerced into her decision to resign.  Based on Ford's testimony, Ford chose to resign to preserve her employment record.  Therefore, the Court concludes that Ford has not established that Defendant constructively discharged Ford, thereby taking an adverse employment action against her.  Nevertheless, the Court will analyze the remaining disputed elements of the *prima facie* case, as well as the showing of pretext, as an alternative to this holding.

### 2.    Qualified for position

Defendant argues that Ford was not qualified for her position because once Ford was convicted of assault, by virtue of her no contest plea, she could no longer be employed at the Youth Center pursuant to Ohio Revised Code § 2151.86(C)(1).  This statute provides in relevant part that: "No appointing or hiring officer shall appoint or employ a person as a person responsible for a child's care in out-of-home care . . . if the person . . . previously has been convicted of or pleaded guilty to any of the following . . . (a) A violation of section . . .2903.13. . . of the Revised Code."  Defendant argues that section 131.02 of the Springdale, Ohio Code of Ordinances–the section which governs assault and under which Ford was charged–is identical to Ohio Revised Code § 2903.13, Assault.  Defendant argues further that "out-of-home care" is specifically defined in Ohio Revised Code §2151.011(B)(27) to include detention facilities such as the Youth Center.  Ford argues that Defendant cannot rely upon its articulated nondiscriminatory reason for termination to argue that Ford was not qualified for the position.

The Sixth Circuit has made it clear that a court must not conflate the distinct stages of the *McDonnell Douglas* inquiry by using a defendant's "nondiscriminatory reason" as a predicate for finding that the plaintiff failed to make a *prima facie* case.  Instead, when

reviewing this element of a plaintiff's *prima facie* case on summary judgment, a court must look at a plaintiff's qualifications before the events which precipitated the adverse employment action.  *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 662-63 (6th Cir. 2000).  A plaintiff must only satisfy the objective qualifications of a position to show that she was qualified.  *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir. 2003) (en banc).  Ford has presented evidence, in the form of the testimony of her supervisors, that her job performance was satisfactory, and therefore the Court finds that she was qualified for the position.

### 3.  Treatment of similarly-situated, non-protected employees

In establishing that a person is similarly situated, a "plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated.' " *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998); *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 709-710 (6th Cir. 2006).  Instead, to establish that an employee is an appropriate comparator, "the plaintiff [must] demonstrate that he or she is similarly situated to the [claimed comparator] in all relevant respects."  *Wright*, 455 F.3d at 710, *quoting Ercegovich*, 154 F.3d at 353.

In the disciplinary context, the Sixth Circuit has held that to be found similarly situated, "the plaintiff and [her] proposed comparator must have engaged in acts of 'comparable seriousness.' " *Id.*, *quoting Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002); *see also Macy v. Hopkins County School Bd. of Educ.*, 484 F.3d 357, 370 (6th Cir. 2007) (explaining that where incidents of misconduct giving rise to discipline form the crux of the similarities between employees, the degree of their misconduct is a factor to be given great weight).  To make this assessment, a court must look "to certain factors, such

as whether the individuals 'have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.' " *Wright*, 455 F.3d at 710, *quoting Ercegovich*, 154 F.3d at 352.

In her Memorandum in Opposition to Defendant's Motion for Summary Judgment, Ford points to the following employees as her comparators:

**Melvin Lewis** - Ford argues that Lewis was charged with assault, but did not receive any discipline related to the charge.  Defendant argues that Ford has identified Lewis for the first time in her Memorandum in Opposition.  Nevertheless, Defendant argues that Lewis was only *charged* with assault, the charges were dismissed, and therefore Lewis was not convicted of a crime under Ohio Revised Code § 2151.86(C)(1).

**David Battle** - Ford argues that Battle was charged with domestic violence before he was hired.  Defendant argues that Ford has identified Battle for the first time in her Memorandum in Opposition.  Defendant points out that Battle was acquitted of the charges, and therefore he was not convicted of a crime under Ohio Revised Code § 2151.86(C)(1).

**Ronald Brock** - Ford argues that Brock was charged with having a firearm in his motor vehicle, but did not receive any discipline related to the charge.  Defendant argues that Ford has identified Brock for the first time in her Memorandum in Opposition. However, Defendant argues that even though Brock was convicted of this crime, it is not one of the crimes listed in Ohio Revised Code § 2151.86(C)(1).

**Kenneth Gray** - Ford argues that Gray was charged with domestic violence, but did not receive any discipline.  Defendant argues that Ford has identified Gray for the first time

in her Memorandum in Opposition.  Defendant argues that the charges against Gray were dismissed, and therefore he was not convicted of a crime under Ohio Revised Code § 2151.86(C)(1).

**Jayme Jones** - Ford argues that Jones was charged with domestic violence, but did not receive any discipline.  Defendant argues that Jones informed Reed of the charges and denied that he was guilty.  (Doc. 28, Ex. A, Reed Aff. ¶ 15)  Defendant points out that the charges were dismissed and Jones was never convicted.  Defendant argues that Jones is not similarly-situated because domestic violence is not a crime listed in section 2151.86(C)(1).

**Shawn Murphy** - Ford argues that Murphy was charged with "Assault-Victim Harmed," but did not receive any discipline.  Defendant argues that Ford has identified Murphy for the first time in her Memorandum in Opposition.  Defendant argues that the charges against Murphy were dismissed, and therefore he was not convicted of a crime under Ohio Revised Code § 2151.86(C)(1).

**Jonathon Burgin** - Ford argues that Burgin was charged with carrying a concealed weapon, but did not receive any discipline.  Defendant argues that Ford has identified Burgin for the first time in her Memorandum in Opposition.  Defendant points out that at the time Burgin was found guilty of the charge, he was no longer employed by Defendant.[5]

**Andrew Tinsley** - Ford argues that Tinsely was charged with "Fighting or Threatening," but did not receive any discipline related to the charge.  Defendant argues that Ford has identified Tinsley for the first time in her Memorandum in Opposition.

---

[5]However, the Court notes that Burgin was charged on August 28, 2005, hired on September 26, 2005, and was employed until October 10, 2005.

Defendant argues that the charges against Tinsley were dismissed, and therefore he was not convicted of a crime under Ohio Revised Code § 2151.86(C)(1).

**Edison Wooten** - Ford argues that Wooten was charged with felonious assault, but did not receive any discipline related to the charge.  Defendant argues that Wooten has identified Lewis for the first time in her Memorandum in Opposition.  Defendant argues that the charges against Wooten were dismissed, and therefore he was not convicted of a crime under Ohio Revised Code § 2151.86(C)(1).

**Stanley Hunter** - Ford argues that Hunter was charged with disorderly conduct, which was pled down from domestic violence.  Ford argues that Hunter did not receive any discipline as a result of the charge.  Defendant argues that disorderly conduct is not a crime of violence, or a crime listed in section 2151.86(C)(1).

**Lawrence Pennington** - Ford argues that Pennington was charged with disorderly conduct, which was plead down from domestic violence.  Ford argues that initially Pennington did not receive any discipline as a result of the charge, even if Defendant did eventually terminate Pennington.  Defendant explains that Reed recommended that Pennington be removed for failure of good behavior.  (Reed Aff. ¶ 17)  Reed's recommendation was based upon Pennington's missed court appearance for a charge of driving under the influence and the resulting bench warrant for his arrest, as well as his plea of no contest on the charge of domestic violence against his wife.  (Id.)  Pennington waived his right to a pre-disciplinary hearing, and was removed on June 15, 2005.  (Id. ¶ 19)

The Court finds this laundry list of employees largely unpersuasive.[6]  There is very little in the record for the Court to evaluate the comparable seriousness between the acts of the listed male employees and the acts of Ford.  Ford has not provided any evidence as to whether these employees were supervised by Reed.  In addition, providing the Court with the docket sheets from the criminal cases does not show that these employees were engaged in the same conduct as Ford.  The docket sheets say nothing about differentiating or mitigating circumstances.  The Court cannot assume, for instance, that a domestic violence charge involves acts of comparable seriousness of a charge of assault.

Moreover, with the exception of three of the employees, all of the employees only had criminal charges against them.  These employees were not convicted of the crimes.  In contrast, at the time Defendant recommended that Ford be removed, Ford had plead no contest to the charges against her.  As to the remaining three employees, the Court finds that Jonathon Burgin cannot be said to be similarly-situated because at the time Burgin was found guilty of the charge, he was no longer employed by Defendant; and Reed

---

[6]The Court notes that Defendant did not specifically move to strike any evidence related to those employees whom Ford failed to identify in discovery.  In any event, the Court finds that such a sanction would not be appropriate.  Rule 37(c)(1) of the Federal Rules of Civil Procedure provides, in pertinent part, that:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed.  In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions.

The Court finds that Ford's failure to disclose was harmless.  Ford did nothing more than rely upon public records, which were available to Defendant on the County's website.  In addition, Defendant would already have in its possession the necessary information regarding the employment status of its own employees.

recommended that Lawrence Pennington be removed based on his plea of no contest. While Stanley Hunter plead guilty to disorderly conduct, there is nothing in the record for the Court to use to compare his actions with those of Ford. The Court is only left with accepting Defendant's argument that disorderly conduct, by its general nature, is not a crime of violence, or a crime listed in section 2151.86(C)(1). Therefore, the Court finds that Ford has not presented sufficient evidence to support this element of the *prima facie* case. However, even if the Court were able to find that Ford has made out a *prima facie* case of discrimination, the Court finds that Defendant is entitled to summary judgment because Ford has not shown that Defendant's articulated nondiscriminatory reason for recommending her removal was pretext for gender discrimination.

### 5. Pretext

A plaintiff may prove pretext by showing either that: (1) the proffered reason had no basis in fact, (2) the proffered reason did not actually motivate the adverse action, or (3) the proffered reason was insufficient to motivate the adverse action. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). The ultimate burden of persuading the trier of fact that the employer intentionally discriminated against her remains at all times with the plaintiff. *Burdine*, 450 U.S. at 253.

As stated above, Defendant's proffered reason for recommending Ford's removal is that once Ford was convicted of assault, by virtue of her no contest plea, she could no longer be employed at the Youth Center pursuant to Ohio Revised Code § 2151.86(C)(1). However, the Court notes that this was not the stated reason on the Recommendation for Removal form. Nowhere on the form is there a citation to section 2151.86(C)(1). Reed made it clear in his deposition testimony that it was Ford's actions themselves, and not the

conviction upon which he recommended Ford's removal.[7]  Moreover, Reed refused to reinstate Ford after the charges against her were dismissed.  Therefore, the Court finds that Ford's actions underlying the assault charge form the basis for Defendant's proffered reason, not the charge or her plea to the charge.

Yet, Ford has not shown that her actions–which she does not dispute were taken–either did not actually motivate the recommendation for her removal, or were insufficient to motivate the recommendation for her removal.  Ford has only identified one employee–Stanley Hunter–who Defendant did not discipline after he was convicted of a crime, and thereby necessarily engaged in some type of criminal activity.  However, without more evidence regarding the nature of Hunter's "disorderly conduct," it is impossible for this Court to determine whether Ford and Hunter engaged in substantially identical conduct. *See Manzer*, 29 F.3d at 1084 (explaining that a showing that the proffered reasons were insufficient to motivate the employment action "ordinarily consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff.")

In showing that the proffered reason did not actually motivate the adverse action, "the plaintiff attempts to indict the credibility of his employer's explanation by showing

---

[7]While Konerman, Defendant's Personnel Director, mentioned section 2151.86(C)(1) in his deposition testimony, Konerman also testified that Reed did not ask for any guidance or input from him making the decision to recommend Ford's removal. (Konerman Depo. at 14.)

Clearly, the policy behind section 2151.86(C) is to prevent harm to youths like those served by the Youth Center.  While Reed or Defendant have never specifically articulated their concern for these young people, the Court can only assume that their motivation for recommending Ford's removal is likewise the protection of the youth under their care.

circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant." *Id.* In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or coverup. *Id.*

Ford makes two arguments in support of their position that it was Ford's gender which motivated Reed's decision to recommend her removal. First, Ford argues that when she first met with Reed, he allegedly promised her that her job was secure. Ford maintains that Reed then did an about-face and recommended her removal based facts he knew about in their meeting and which she never disputed. Ford argues that Reed's inconsistency casts doubt upon Defendant's articulated reason.

The Sixth Circuit has recognized that evidence of pretext may consist of a defendant's changing explanations. *Cichewicz v. UNOVA Indus. Automotive Systems, Inc.*, 2004 WL 291178, *4 (6th Cir. Feb. 12, 2004) (unpublished), *citing Fox v. Certainteed Corp.*, 1999 WL 1111495, at *5 (6th Cir. Nov. 23, 1999) (unpublished) (explaining that evidence tending to demonstrate the falsity and inconsistency of the employer's explanations for the plaintiff's discharge may raise an inference of pretext); *Howard v. BP Oil Co., Inc.*, 32 F.3d 520, 526 (11th Cir. 1994) ("identification of inconsistencies in the defendant's testimony is evidence of pretext"); *EEOC v. Ethan Allen*, 44 F.3d 116, 120 (2d Cir. 1994) (explaining that discrepancies in a defendant's explanations constitutes evidence of pretext); *Lent v. Goldman Sachs & Company*, 1998 WL 915906, at *8 (S.D.N.Y. Dec. 30, 1998) (unpublished) ("[w]hat defendant calls 'minor inconsistencies' may be evidence of pretext "). However, the Court finds that any inconsistency between Reed's alleged statements that Ford's job was secure during their initial meeting, and Reed's decision to

recommend Ford's removal is not indicative of discrimination. At the time that Ford met with Reed, Defendant had not yet conducted its internal investigation. As Reed explained in his deposition:

> . . . with criminal charges, the discretion isn't solely mine, . . . the Court had policies and procedures that I had to follow. It wasn't that I could just say, "Oh, you know, Catrice is okay, she can stay."
>  . . .
> We do an investigation to determine validity as best we can. The decision to discipline or not discipline, or not apply the discipline is kind of left as a result of that investigation, and whatever the penalty is for whatever the incident is, that's how we apply it. We can do that regardless of the outcome of the criminal action.

(Reed Depo. at 13-14) There is nothing in the record which would contradict Reed's statement that the investigation would impact the disciplinary action taken. While this may not have been explained to Ford during her meeting with Reed, the Court finds that this is not evidence of pretext. Defendant's progressive discipline system provides that termination is a potential disciplinary action. Despite any promises made by Reed, there was always the possibility that the investigation would result in termination.

Ford also argues that the manner in which Bowman handled the investigation of the matter shows that Defendant's articulated reason is pretextual. "Although a failure to follow internal procedures can be evidence of pretext, such a failure is, by itself, generally insufficient to support a finding of pretext." *Macy*, 484 F.3d at 369 (citations and quotations omitted). In addition, the Sixth Circuit does not require "that the decisional process used by the employer be optimal or that it left no stone unturned." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). Instead, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action. *Id.* Moreover, Ford never disputed the underlying facts–that she hit Cherry's wife.

Therefore, the Court finds that the manner in which the investigation was conducted is not evidence of pretext, and the Court concludes that Ford has not shown that Defendant's nondiscriminatory reason for recommending her removal was a pretext for illegal discrimination.  Accordingly, Defendant is entitled to summary judgment as to Ford's gender discrimination claim.

### C.  Discrimination under Ohio law

The Ohio Supreme Court has held that "federal case law interpreting Title VII of the Civil Rights Act of 1964 is generally applicable to cases involving alleged violations of R.C. Chapter 4112."  *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981).  Therefore, the Court concludes that because Ford's discrimination claim under Ohio law is subject to the same analysis as above, Defendant is entitled to summary judgment on Ford's state law discrimination claim.[8]

---

[8]While the Court would still reach the same conclusion, the Court notes that in analyzing a claim of constructive discharge, the Ohio standard differs from the Title VII standard in that it utilizes only the first prong of the inquiry, whether the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign.  *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 478 (6th Cir. 2002), *citing Mauzy v. Kelly Servs., Inc.*, 664 N.E.2d 1272, 1280-81 (1996).  The Ohio Supreme Court has not adopted the second prong, which makes an objective inquiry into the employer's intent.  *Id.* Therefore, in analyzing Ford's claim under Ohio law, the Court concludes that Ford has shown an adverse employment action.  Nevertheless, the Court's conclusions regarding the treatment of similarly-situated non-protected employees and pretext would entitle Defendant to summary judgment on Ford's Ohio law claim.

III.    **CONCLUSION**

Accordingly, it is hereby ordered that Defendant Hamilton County Juvenile Court's Motion for Summary Judgment (Doc. 28) is hereby **GRANTED**.  This matter shall be **CLOSED** and **TERMINATED** from the docket of this Court.

IT IS SO ORDERED.

_____*/s/ Michael R. Barrett*_____
Michael R. Barrett, Judge
United States District Court